## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MICHAEL J. DAUGHERTY,

Plaintiff,

v.

FEDERAL TRADE COMMISSION,

    Defendant.

Civil Action File
No.: _____

**Jury Trial Demanded**

## COMPLAINT

Plaintiff Michael J. Daugherty ("Daugherty") brings this complaint against the United States Federal Trade Commission pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b).

Plaintiff has exhausted his administrative claims by filing the required administrative claim form with the Defendant and having his administrative claims denied. *See* Ex. A (Federal Trade Commission Form 95); Ex. B (Federal Trade Commission Denial Letter).

## INTRODUCTION

This action seeks to recover damages from the Federal Trade Commission ("FTC") based on FTC employees' intentional involvement in non-discretionary, wrongful actions taken on behalf of the FTC, involving, at a minimum, the illegal

1

exercise of the FTC's investigative, prosecutorial and regulatory powers. These actions were calculated to directly and proximately cause damage to Plaintiff. Specifically, and despite the fact that Plaintiff's company, LabMD, Inc., was in full compliance with all relevant data-security and privacy laws the United States, the FTC employees, without any substantial justification, willfully misused and exceeded their legitimate regulatory authority to fabricate an illegal investigation of LabMD and then engage it, with further illegal activity, in a protracted civil prosecution based on illegally obtained and fraudulently presented information. The FTC has continued its failure to acknowledge this illegal activity to the present time. These wrongful and intentional actions resulted in severe damage to the Plaintiff, including the financial hardship imposed by the FTC's investigation and LabMD's civil prosecution, and the consequent destruction of his wholly owned business.

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this claim against the United States for money damages pursuant to 28 U.S.C. § 1346(b)(1).

2.     Plaintiff resides in the Northern District of Georgia. Venue is proper under 28 U.S.C. § 1402(b).

## PARTIES

3.      Daugherty resides in Atlanta, Georgia.  His address is 425 Broadland Rd., N.W., Atlanta, GA 30342.

4.      Daugherty is the sole owner and was the chief operating officer of LabMD, Inc., ("LabMD") a business corporation created under the laws of Georgia and operating as a cutting-edge cancer detection laboratory serving over 750,000 customers.

5.      Defendant is sued for damages resulting from the reputational and financial destruction of LabMD.  This occurred uniquely because of the wrongful and intentional acts of certain employees of the FTC purporting to enforce the law while acting on behalf of the United States.  The FTC generally holds itself out to the public as a "law enforcement" agency.  The employees at the FTC involved in this wrongful conduct were at all times complained of herein: (1) acting within the non-discretionary scope of their employment with the United States; (2) purporting to enforce the laws of the United States; (3) acting intentionally and knowingly with regard to the exercise and misapplication of their regulatory authority to cause harm to LabMD; and (3) would, if acting in their individual capacity, be liable for damages to Plaintiff under Georgia law.

3

## FACTUAL SUMMARY

### *The Federal Trade Commission*

6.     The FTC is an independent agency of the United States government whose principal mission in part is the promotion of consumer protection through enforcement proceedings authorized by its statutory authority to investigate and civilly prosecute alleged violations of the law through its enforcement authority.  It is outside the mission of the FTC to investigate and civilly prosecute alleged violations of the law based on incomplete investigations, manufactured evidence, knowledge that there is no violation of the law and that such prosecution is intentionally executed with actions that are in derogation of the law.  The FTC was created under and exists by authority of the Federal Trade Commission Act, 15 U.S.C. §§ 41-58, as amended.  All of the acts that are the subject of this complaint were not within the discretion of the FTC or its employees.

### *Michael J. Daugherty and LabMD*

7.     Daugherty is the Founder and President of LabMD, a corporation created under the laws of the State of Georgia in 1996 specializing in laboratory diagnostic cancer testing. He was the President and Chief Executive Officer of LabMD, and its sole shareholder, at all relevant times.

8.     LabMD could not continue its business as a going concern and was forced to cease its active business operations in 2014 as a direct result of the financial, business and reputational impact of the FTC's initiating an investigation of LabMD based solely on what it knew to be illegal evidence and subsequent relentless litigation, in which the FTC continued to create illegal evidence and misrepresent the good faith inception of its actions, known at all times to be solely based on evidence illegally obtained or created and fraudulently presented.

9.     As a result of the FTC's baseless investigation and civil prosecution based on false evidence that the FTC had fraudulently created at the inception and at various stages out of thin air throughout the proceeding, LabMD was no longer able to operate as a medical laboratory, but it continues today as a non-operating entity under Georgia law that securely stores and protects its patient data in full compliance with all relevant privacy and security laws.

### *Tiversa Holding Corporation*

10.    Tiversa Holding Corporation ("Tiversa") was a Pennsylvania corporation that at all relevant times purported to provide cyber- and data-security services to the public.  Tiversa's owner, President and CEO was Robert Boback ("Boback").

11.     Prior to 2007, the U.S. Attorney for the Western District of Pennsylvania had engaged Tiversa as a private entity to work with the Federal Bureau of Investigation ("FBI") to search for and obtain computer-based evidence of child pornography for use in criminal prosecutions.  At some point during Tiversa's engagement, FBI Agent Greg  Frankhouser desired to boost Tiversa's ability to seek out such evidence and personally delivered to four Tiversa employees proprietary software with enhanced internet search capabilities developed exclusively for the FBI and for national security purposes.  Tiversa was instructed to use this software extensively to continue to search the internet for inculpatory materials reflecting child pornography, access the suspect's computer systems, download the inculpatory files and turn those files over to the FBI.

12.     To the public, Tiversa presented itself as a legitimate cyber-security business with extraordinarily powerful internet search capabilities.  However, the tool they were using was the FBI's.

13.     In 2007 Boback testified before Congress on behalf of Tiversa as an expert about peer-to-peer networks and touting Tiversa's capabilities.

14.     Two months after Tiversa came to the FTC's attention because of Boback's testimony and Tiversa's extensive publicity, Tiversa began working with

the FTC which had requested that Tiversa provide information regarding private companies' data-security practices.

### MARY BETH BUCHANAN'S ROLE AS US ATTORNEY

15.    Mary Beth Buchanan was the US Attorney for the Western District of Pennsylvania, based in Pittsburg, from 2001 to 2009.

16.    From her relationship with Tiversa as a vendor of services to the FBI and the resulting data Boback supplied to her office through the FBI, Buchanan gained a reputation as one of the country's most aggressive child pornography prosecutors.

17.    Buchanan's reputation was in part based on the work of Tiversa's employees, which included Richard Wallace ("Wallace"), a Tiversa employee from 2007 to 2014.  Wallace worked concurrently on Tiversa as well as FBI projects.

18.    Tiversa's work was so important to Buchanan that she went so far as to authorize the FBI to install a dedicated DSL line in Wallace's home to allow him to freely access and use the FBI's proprietary surveillance software.

19.    Following her time as U.S. Attorney, Buchanan joined the law firm Bryan Cave LLP in New York, NY.  In 2014, Wallace retained Buchanan to represent him for the FTC's administrative proceedings against LabMD.

### TIVERSA'S RACKETEERING SCHEME

20.    By day Tiversa worked for the FBI under the cover of providing "data security" services to the public.  However, by night Tiversa misappropriated and misused the FBI's proprietary software for its own illegal "shakedown" enterprise. Instead of using the software to exclusively search peer-to-peer networks for child pornographers, as was the sole mission approved by the United States Attorney and the FBI, Tiversa took advantage of the lax supervision of its use of the FBI software and used it to illegally access private computers and computer networks to a) steal secure data; b) contact the owner of the computers and networks it had hacked; c) allege that they suffered a "data leak;" and d)  offer Tiversa's expensive cyber-security and recovery services coupled to long-term monitoring of peer-to-peer networks to "search" the internet for the information Tiversa knew it had stolen.

21.    When a company rejected Boback's overtures, Boback would retaliate by passing the information along to the FTC. Likewise, the FTC would pass along companies they were investigating so Tiversa would profit from this information via offers of services, blackmail, and inuendo.

22.    Central to its racketeering enterprise, Tiversa utilized its access to the FBI proprietary software to, among other practices:

a.     access private computers and computer networks to illegally steal secured data for use as evidence of a 'data breach;'

b.     modify the source address of the information it obtained with the FBI software and create false Internet Protocol (IP) packets to either hide the identity of the sender, impersonate another computer system or both,

c.     hide Tiversa's theft of data by making it appear that unauthorized outside, and sometimes foreign entities were accessing and sharing secured proprietary data which Tiversa had legally obtained with its own claimed proprietary (but non-existent) software;

d.     contact the owner of the computers and networks Tiversa had hacked, allege that the stolen data had "leaked" onto the internet and offer Tiversa's expensive cyber-security and recovery services to monitor and remediate the situation.

23.     During his employment with Tiversa, Wallace was tasked by Boback to work with the FBI software.  Wallace's parallel job was to steal, over the internet, business and personal files not involved in child pornography.  This theft was directly from the innocent owners' computers and the stolen data was then manipulated to falsely infer that the files were circulating on the internet rather than having come directly from the innocent parties' computers where the files were

stolen. The FTC had evidence at all relevant times that the LabMD file was taken only from LabMD's computer folder as early as 2009.

24.     Wallace's hacking, theft and metadata manipulation were the backbone of Tiversa's illegal shakedown enterprise.   In addition to hacking LabMD and thousands of corporations, Wallace accessed files from entities such as a government contractor's private network to steal the blueprints for the President Barak Obama's Marine One helicopter, manipulating the file to give the appearance that it had been found on a computer in the Middle East.   Boback also announced that Tiversa "discovered" on the internet something that actually was what Wallace had accessed -- US Supreme Court Justice Breyer's personal and financial information .   These revelations created what Boback intended, i.e. national media attention on instances of fraudulent computer vulnerabilities created by Tiversa all so that Tiversa could enhance its reputation and increase its customer base.

### *TIVERSA MEETS THE FTC AND FORMS A RELATIONSHIP*

25.     After Boback testified before Congress in 2007 about Tiversa's cyber-security and internet search capabilities, Mary Eaton, an attorney employed by the FTC, contacted General Wesley Clark.   Clark served on Tiversa's Board and Settlemyer evidenced interest in Tiversa's seemingly unique and extraordinarily powerful cyber and internet capabilities.

26.     Clark then introduced the FTC to Tiversa, at which point FTC staff members began communicating directly with Tiversa, communicating frequently, sometimes weekly, and discussing information available on P2P networks on the internet.

27.     Over time the relationship between Tiversa and the FTC grew as Settlemyer and others at the FTC evidenced an eagerness to utilize Tiversa's technology and information gathering capabilities to identify targets for their own civil investigations and resulting prosecutions.

28.     Subsequent to the FTC staff's visit t Tiversa's facility in Pittsburgh, Pennsylvania, the FTC began requesting information from Tiversa about secure or confidential data "leaked" over the internet.

29.     In March, 2009, Carl H. Settlemyer III ("Settlemyer") introduced Boback to Alain Sheer ("Sheer"), who was also an attorney employed by the FTC.

30.     Shortly thereafter Ruth T. Yodaiken ("Yodaiken"), also an attorney employed by the FTC, was introduced to Boback and from time to time introduced Tiversa to the Washington Post newspaper, her former employer.

31.     In the Spring, 2009, FTC personnel again met with Tiversa in Pittsburgh and formally requested that Tiversa provide it with information about companies whose data had "leaked" over the internet.

11

32.     Shortly after this meeting and reflecting the extent of interaction, Wallace emailed a question to Sheer.  Sheer responded by telling Wallace he should never contact him again by any traceable means, including emails, FedEx deliveries and faxes.

### *Creation of the Sham "Privacy Institute"*

33.     The FTC is empowered to compel evidence through its Civil Investigation Demand ("CID") subpoena which allows FTC investigators[1] to access the information relevant to an investigation.  Before a Commission Investigator can issue a CID, an FTC Commissioner must sign off on the request.

34.     Settlemyer, Yodaiken and Sheer made it known to Boback they wished to formalize their possession of information provided by Tiversa.  They sought to issue a CID to Tiversa pertaining to information Tiversa had provided for their program of investigation and civil prosecution for businesses who provided unsecure protection for their customers' confidential information.   The FTC needed a legitimate source to start the investigation and sought to justify and legitimize their actions under cover of the CID.

---

[1] Settlemyer, Yodaiken, and Sheer, in their role as FTC Attorneys, were also acting at all relevant times as FTC investigators of LabMD.

35.    Boback objected to Tiversa's providing the information directly to the FTC through a publicly available CID, expressing his need to conceal Tiversa's involvement as a source of information to the FTC for business purposes.  In reality, Boback was aware that the FTC was requesting information that Tiversa had illegally obtained with the proprietary FBI software.

36.    In response to Boback's stated business "concern," Settlemyer, Yodaiken and Sheer devised a scheme that would allow them a legitimate "cover" to obtain Tiversa's information which it already possessed, and concurrently completely mask Tiversa's role in the matter without issuing a CID to Tiversa.  To conceal Tiversa as the source of its information, Boback, Settlemyer, Yodaiken and Sheer together agreed

(1) Boback and Tiversa would create a shell company, and;

(2) the FTC would issue a CID to the "shell" company instead of to Tiversa;

37.    Boback proceeded to create a shell company called "The Privacy Institute" on June 3, 2009 and start to execute the scheme designed to circumvent the problem of the FTC's directly accessing documents from Tiversa.

38.    The Privacy Institute had no legitimate business purpose.  The only "business activity" that took place was its acting as a shell intermediary to disguise Tiversa's transfer of stolen files to the FTC.

39.    Sheer and Yodaiken then expressed a further concern that an FTC Commissioner would not approve their sweeping CID issued to The Privacy Institute since Tiversa and The Privacy Institute were never the subject of a legitimate FTC investigation.  To further the scheme to cover up the source of its information and ensure an FTC Commissioner's approval, Sheer and Yodaiken included the names of two companies already under FTC investigation—Rite-Aid and Walgreens—to disguise the true nature of the CID and the scheme that supported their activities.

40.    The FTC Commissioner who authorized and signed the CID would not have done so had he been told the truth about the sham Privacy Institute, including the fact that Sheer and Yodaiken had plans to investigate parties identified from the Privacy Institute -- other than Rite-Aid and Walgreens -- despite the fact that such parties identified from the Privacy Institute either had (1) in reality allowed no disclosures or (2) involved no complaining witness, and (5) the information had no originating source outside the companies which legitimately owned or held the information.

**THE FTC ORDERS MANIPULATION OF THE PRIVACY INSTITUTE DATA**

41.    Based on Boback's characterization of Tiversa's cyber capabilities, Sheer, Yodaiken and Settlemyer expected that Tiversa would turn over to them thousands of examples of private and confidential data held by corporations

circulating freely on the Internet.  They were surprised when Boback only provided eighty six examples and also had notice of how Tiversa misrepresented the situation to them.

42.    Sheer, Yodaiken and Settlemyer further observed that the metadata on the data provided by Tiversa actually showed that the data was not circulating on freely on the Internet, and it showed that Tiversa had in reality been taken the data from the computers of the legitimate owners or holders of the data.  This revelation created a problem for Sheer, Yodaiken and Settlemyer in that they 1) had a CID issued that involved innocent parties other than Tiversa, who by all indications was the party who had stolen the data from the computers of the legitimate holders of the data; 2) had no case against the companies who held the data; 3) understood that if the FTC used the data with the original metadata, they would be guilty of having instituted civil prosecutions based on Constitutional violations; 4) had conspired with Tiversa to manipulate an investigation, manipulate a CID issuance, and mask the source of the data through the Privacy Institute; and that 5) in all likelihood Tiversa had committed cyber-crimes in obtaining the data.

43.    Rather than reveal the truth about the CID and Tiversa, Sheer instructed Tiversa to take the Privacy Institute data and remove the metadata, thereby making it impossible to show from where the data had originated while simultaneously

15

making it possible for Sheer, Yodaiken and Settlemyer to continue to use the data to pursue the companies involved based on false evidence.

44.    Boback complied with Sheer, Yodaiken and Settlemyer's request to falsify the evidence by removing the metadata and returned the materials to the FTC.

45.    Sheer, Yodaiken and Settlemyer used the manipulated data to proceed with investigations and the threat of civil prosecution, obtaining thereby numerous consent decrees.

46.    Sheer, Yodaiken and Settlemyer knew at all relevant times that The Privacy Institute had no assets, no employees, no physical location, that it did not independently hold any documents or files and that the data that had been returned in response to the CID was altered and false.

### THE FTC-TIVERSA SCHEME CONFRONTS THE PROBLEM of SPREAD

47.    Sheer and Yodaiken had solved their "source of evidence" dilemma. They had used the artifice of The Privacy Institute to obtain the data originally requested from Tiversa, and by having the metadata removed also removed proof that the data had not in fact circulated on the Internet but, to the contrary, had been taken from the owners' computers.

48.    However, Sheer and Yodaiken quickly realized that another dilemma needed to be solved. When LabMD was approached by the FTC and offered a

"consent decree" regarding LabMD data that was alleged to have circulated on the Internet, Daugherty refused the "offer."   That meant, in order to continue their efforts, Sheer and Yodaiken had to satisfy the elements of the basis of their civil suit, i.e. show that the data had "spread" on the Internet and that damages were therefore suffered as a result of the "spread."

49.     To solve this new problem, Sheer met with Boback and Wallace and told them that in order for the FTC to investigate and prosecute LabMD  the FTC needed to show "spread," i.e. that the data had in fact circulated over the Internet. Sheer made it clear that the evidence provided by Tiversa regarding LabMD needed to show that the information had actually *spread* over the internet on P2P networks as a result of the alleged leak.  Sheer indicated he was not interested in evidence that simply had been leaked but not "spread" and further indicated that if the information was coming from a U.S. Citizen, the FTC would not use it.  Ex. C at 2. Without evidence of leaks *and* "spread" it would be difficult, if not impossible, for the FTC pursue investigations and civil claims without damages.

50.     Sheer, Yodaiken, and Settlemyer, despite knowing that Tiversa had been manipulating the files, continued to pressure Tiversa for even more manipulation to manufacture evidentiary proof of "spread" and be able to show damages.

51.    Boback, in response to this pressure, in turn pressured Wallace into manipulating document metadata to show that the allegedly leaked information had "spread" through P2P networks.  Wallace was reluctant to manipulate the data and objected to being forced to lie about his activities.

52.    Due to Wallace's increasing reluctance, Boback then directed the FTC to communicate with Tiversa CFO Dan Kopshak instead of Wallace.  Kopshak began having weekly phone calls with the FTC with Wallace sitting in.  Over time these weekly calls took on a financial aspect with Kopshak inquiring how Tiversa would be compensated by the FTC for providing a list of companies from which Tiversa stole files.

53.    In March 2014 Wallace resigned from Tiversa after being subpoenaed as a witness and told Boback he would not lie, as instructed by Boback, under oath to the FTC regarding LabMD's allegedly leaked file.

54.    Having confronted and successfully solved with Tiversa the questions about the legitimacy of the FTC's activities, Sheer, Settlemyer, Yodaiken and Tiversa continued their relationship whereby they all benefitted from the activities of the other.  The FTC was receiving illegally obtained and intentionally mischaracterized evidence that created a cover of legitimacy for its investigations and prosecution from Tiversa.  In return Tiversa had an outlet to "punish" those who

rejected Boback's shakedown overtures and it received insider information that allowed it to direct its business operations and exploit media coverage to its own benefit.

55.    In 2009, subsequent to Tiversa's turning over its list of 100 companies to the FTC, Sheer and Yodaiken, in violation of FTC rules, polices, procedures, and guidance, provided Boback with intimate details about forthcoming investigations.

56.    Boback used this information for his own purposes, engaging in such activities as bragging to Tiversa's business partner, LifeLock, and telling LifeLock employees the FTC was preparing federal cases against 100 or so companies that have breached consumer information via P2P, and subsequently warning those same employees that the FTC letters had not yet gone out, so the companies would not know what they would be talking about.

57.    Boback also leveraged the information the FTC illegally provided him to boost Tiversa's business prospects by activities such as providing information to the Washington Post, resulting in an article on detailing a breach of the US House of Representative's Ethics Committee's information via P2P.  Boback bragged to Sheer, Yodaiken, and Settlemyer that he was the undisclosed source for the story and similarly used the story in an attempt to sell the House Ethics Committee his bogus services.

58.     In the end, the FTC and Tiversa had formed a relationship where the Sheer, Yodaiken and Settlemyer proactively used Tiversa to pass along stolen information to them, coached Tiversa on how to make the files it was providing actionable for the FTC's usage and then they relied on, and utilized, the fruits of their coaching and data manipulation where Tiversa provided information to justify individual company investigations.   For its part, Tiversa used information it wrongfully obtained from the FTC to advance its own purposes, including, as in the case of LabMD, to punish those who did not accept its shakedown and create a climate of fear so others would more readily accept those services.

### THE FTC ATTACKS LABMD

59.     In late 2008, in executing its shake-down enterprise, Tiversa hacked LabMD's computer network with the FBI's proprietary software and stole a 1718-page file (the "1718 File") containing confidential and legally protected patient information.

60.     In 2008, Tiversa contacted LabMD and falsely represented that it found the 1718 File on the internet and represented it was being shared on the internet. Boback never returned or offered to return the patient information data Tiversa had hacked.

61.    As part of Tiversa's usual sales pitch to encourage the purchase of remediation services, Boback attempted to sell Daugherty Tiversa's data security services by falsely representing that it "found" LabMD's 1718 File spreading over the internet on P2P networks.

62.    LabMD's own cyber-security protocols and specialists investigated the claim and cast doubt on  Boback's "pitch."  Rather than pay for the "service," Daugherty determined that there was no leak, rebuffed the shakedown and declined Tiversa's data security services.

63.    In retaliation for LabMD's refusal to purchase the bogus services, Tiversa provided the 1718 File to the FTC as part of the initial data the FTC had requested from Tiversa.  Boback specifically instructed one of his employees to make sure LabMD was at the top of the list' of companies given to the FTC.

64.    Like the other data from the original data Tiversa provided to the FTC, the original copy of LabMD's 1718 File that Tiversa provided to the FTC contained LabMD's Atlanta IP address, indicating that the file had neither spread over the internet and that had it actually been taken from LabMD's computers. After Tiversa provided the FTC with the 1718 File, Sheer told Tiversa that the file's metadata indicated it originated on LabMD's computer, thereby evidencing Sheer's

knowledge, and thereby the FTC's knowledge, that the LabMD investigation had no basis in the 1718 file.

65.     Sheer also informed Tiversa that the original metadata on all the files provided by Tiversa rendered all the files, including LabMD's file, non-actionable. Sheer indicated that Tiversa should strip all the files of their metadata because the metadata showed that the files originated on the companies' computers, not somewhere circulating on the internet -- meaning that the files, including the LabMD file, were non-actionable and of no use to Sheer.  Despite his knowledge, Sheer continued to take steps to have the proof for the FTC's claim against LabMD manipulated, purposely continuing his investigation and later civil prosecution based on a lie.

70.     69.  Tiversa complied with Sheer's request and removed the metadata.. In January, 2010, , Sheer had already informed Daugherty that the FTC was conducting a non-public inquiry into LabMD and that the investigation was predicated exclusively on the LabMD 1718 File.

71.     Daugherty knew nothing of the metadata being removed.  Nor did Sheer inform Daugherty that the file had been turned over *after* Tiversa established a shell corporation for the FTC and after Sheer had coached Tiversa on how to provide actionable files, including stripping metadata on the 1718 File's IP address.

72.     Sheer, Yodaiken, and Settlemyer did not alert the full FTC Commission about its illegal activities.  Despite being ignorant of the evidence manipulation, FTC Commissioner Rosch commented on LabMD's efforts to quash the investigation and expressed concerns about Tiversa.  Commissioner Rosch warned against relying on information provided by Tiversa as a basis for the investigation, and based his comments solely on the fact that Tiversa was more than just an ordinary witness, informant or 'whistle-blower,' but rather was a commercial entity that had a financial interest in intentionally exposing and capturing sensitive files on computer networks, and a "business model" of offering its services to help organizations protect against similar infiltrations.

73.     Commissioner Rosch was also critical of the fact that after Tiversa's alleged "discovery" of the 1718 File on a peer-to-peer network in 2008, Tiversa had repeatedly solicited LabMD to sell its investigative and remediation services regarding the alleged breach *long before* the proffered date that Sheer contacted LabMD.  Commissioner Rosch further advised that under such circumstances the FTC staff should not have inquired about the 1718 File and should not have relied on Tiversa for evidence or information.

74.     Upon information and belief, if Commissioner Rosch had known all the facts, he would have ended Sheer, Yodaiken, and Settlemyer's scheme.  Despite

Commissioner Rosch's comments, however, Sheer, Yodaiken, and Settlemyer continued their investigation and subsequent prosecution of LabMD despite this warning.

75.     To the contrary, Sheer chose to further increase the FTC's reliance on Tiversa and persisted in doubling down on his efforts to vigorously pursue the FTC's administrative investigation.

76.     In a public announcement on August 28, 2013, FTC cited the stolen and manipulated 1718 File, as "evidence" and the basis for a civil complaint and commenced its civil prosecution alleging that LabMD violated Section 5(a) of the FTC Act.

77.     To bolster the FTC's position in the complaint proceeding, Boback later directed Wallace in October 2013 to create a "txt file" to show four San Diego, California IP addresses on the 1718 File to falsely demonstrate "spread."  Boback personally selected the IP addresses to be used to show the file was "found" in California, and then Sheer relied on Boback's testimony to claim that the 1718 File had been found on a public P2P network as recently as November 2013.

78.     Sheer Yodaiken, Settlemyer and others at the FTC intentionally continued the FTC's civil prosecution of LabMD aware that the 1718 File evidence was again fraudulently altered and they pursued the case with the knowledge that

the FTC had been, and continued to be, working closely with Tiversa and supporting Tiversa's illegal shake down scheme.  Despite this, Sheer, Yodaiken, Settlemyer and others never disclosed the true nature of the previously questioned relationship with Tiversa and continued to conceal Tiversa's illegal activities, which were much more sinister than Commissioner Rosch had speculated.  Specifically Sheer, Yodaiken, Settlemyer and others actively, among other actions:

a)      accepted data from Tiversa via The Privacy Institute knowing that Tiversa removed the metadata to cover up the source of the materials;

b)      knew the 1718 File was not actionable because the original metadata indicated the file never left LabMD's computer and further knew that the metadata was falsified to justify the FTC's continued prosecution of its investigation and civil action against LabMD;

c)      had coached Tiversa to manufacture the evidence of "spread" on the internet which occurred in 2013;

d)      knowingly used fraudulently evidence to 1) form the basis of an official FTC investigation, 2) justify to the Federal Trade Commission a basis for the civil prosecution of LabMD, and 3) vigorously pursued civil prosecution at all levels; and

e)      took Boback's deposition in the LabMD proceeding so as to manipulate his testimony and put sworn testimony on the case record knowing at all times that

the information was calculated to mislead and lacked candor, including the complicity among the FTC, Boback and Tiversa about the manufactured evidence; and

f)      understood and intended that their continued effort to investigate and prosecute LabMD meant the destruction of LabMD as a continuing enterprise.

### *THE IMPORTANCE OF RICHARD WALLACE'S TESTIMONY*

79.    The FTC took advantage of one additional opportunity to keep secret the illegal roots of its civil investigation and prosecution of LabMD.

80.    When Boback applied pressure to Wallace to lie about Tiversa's scheme, Wallace left Tiversa's employ and revealed to LabMD some of the facts of Tiversa's illegal activity. LabMD then arranged for Wallace to give testimony before the FTC Chief Administrative Law Judge but Wallace required a grant of immunity from the Justice Department before he would testify.

81.    Wallace had sought to hire Mary Beth Buchanan, the former US Attorney for the Western District of Pennsylvania who was responsible for Tiversa's ability to possess and illegally use the FBI proprietary internet search software, to represent him in his testimony in the FTC administrative proceeding.

82.    The Justice Department did give Wallace immunity for the matters about which he would testify but not for information about which he would not

testify.  Wallace's interests, therefore, aligned with his full disclosure of all facts regarding Tiversa.  Full disclosure would also have been in LabMD's interests but not in the interests of the FTC or Wallace's then attorney Buchanan.

83.    Buchanan had accepted the representation of Wallace despite Tiversa's had been her vendor, despite Tiversa's misuse of the FBI software Buchanan provided to Tiversa while she was serving as the US Attorney and despite the acceptance was in violation of the law.  In addition, Buchanan had been responsible to properly supervise Tiversa's use of the FBI software and certainly not to allow it to be used for the illegal activities about which she was now representing Wallace.

84.    Buchanan never explained this conflict to Wallace and yet Wallace revealed the entire situation to Buchanan. This disclosure by Wallace would have made obvious to Buchanan that she bore responsibility for those activities.

85.    When Wallace received the requested qualified immunity tied to his testimony, he was prepared to tell the FTC the entire truth about his and Tiversa's activities.

86.    Despite her own conflict to not revealing the full truth of Wallace and Tiversa's unlawful behavior, and her role in facilitating that activity, Buchanan retained the Wallace representation.

87.    On April 29, 2015, shortly before Wallace's testimony, Buchanan undertook on her own to meet with the individuals from the FTC who were prosecuting the case against LabMD and who also were aware of Tiversa and Wallace's illegal activities and the FTC's role in those activities.

88.    The FTC was represented at the meeting with Buchanan by several high-ranking FTC officials, including:

- Laura VanDruff, Lead Complaint Counsel;

- Jarad Brown, Complaint Counsel;

-Robert Kaye, Chief Litigation Counsel for the Bureau of Consumer Protection;

-Bob Schoshinski, Assistant Director, Division of Privacy and Identity Protection;

-Dan Kauffamn, Deputy Director, Bureau of Consumer Protection; and

-Christopher Olsen, Deputy Director, Bureau of Consumer Protection

89.    For unconfirmed reasons Buchanan made a proffer of Wallace's evidence at the meeting regarding Wallace's upcoming testimony.  This proffer however, was unnecessary because (1) Wallace had already received a grant of criminal immunity to the extent of his testimony, and (2) there was no legitimate reason to discuss her client's anticipated testimony with the FTC, especially without participation by LabMD's counsel.

90.     Buchanan and the FTC did have a common reason to limit Wallace's testimony, however, because of the consequences to each of them that exposure of the truth would bring.

91.     At the meeting Buchanan also agreed with the FTC that she would handle the anticipated re-direct examination of Wallace, the extent of which would cover the grant of immunity.  In fact, it was in the collective interests of Buchanan and the FTC to limit the testimony of Wallace so as to not implicate either Buchanan or the FTC investigators and attorneys.

92.     Buchanan did not inform, or coordinate, this strategy with Plaintiff's counsel prior to securing the FTC's permission, nor did she disclose to them the role that she, the US Attorney's office and the FBI had played in facilitating the execution of Tiversa's shakedown scheme and use of the FTC to enhance the effect of that scheme.

93.     In fact, the results of Buchanan's meeting with the FTC and the limited agreed proffer regarding his testimony ensured that Wallace's testimony would not disclose that Wallace had found the 1718 File with proprietary FBI surveillance software or that the FTC had cooperated with Tiversa to justify the FTC's investigation and prosecution of LabMD.  D

94.    At no time did Buchanan ever inform LabMD's counsel of the foregoing information regarding Tiversa and the FBI, which perfectly aligned Buchanan's interests with the FTC's interests.

95.    Buchanan's meeting further ensured that Buchanan and the FTC would have continuing control over Wallace in discouraging him to reveal the truth about the US Attorney and FBI's involvement because Wallace's immunity would not cover the areas Buchanan and the FTC agreed would be left out of Wallace's testimony.

96.    Buchanan's conflict also meant that Buchanan's motivation to help Wallace as a client was compromised because her interest would be to protect her personal legacy as an aggressive U.S. Attorney, protect the FTC's activity from exposure to the public and keep the fact that her office was responsible for Tiversa's criminal enterprise out of the public arena.

97.    Buchanan also had knowledge sufficient to conclude that when Tiversa's illegal scheme was publicly exposed it could also call in to question any convictions that relied on evidence obtained by Tiversa and destroy her legacy.

### FTC PERSISTS IN CONTINUING ITS ILLEGAL EFFORTS

98.    The FTC, as an independent agency of the United States, concealed the true nature of its activities from its own Office of Administrative Law Judges, in

30

particular Chief Administrative Law Judge Chappell, during the administrative hearing on its complaint against LabMD.

99.     The FTC, as an independent agency of the United States through Sheer, Yodaiken and Settlemyer and others, concealed the true nature of the FTC's activities involving Tiversa from its own Commissioners, who noted that if there had been evidence that Tiversa acted as an "agent" or "adjunct" of the FTC in obtaining the 1718 file, the circumstances supporting the Commission's reversal of the ALJ decision would have been different.

100.    The FTC, as an independent agency of the United States through Sheer, Yodaiken and Settlemyer and others, misrepresented the truth and continued to conceal the true nature of its activities from the United States Court of Appeals for the Eleventh Circuit and the Eleventh Circuit's Special Master, Magistrate Judge Walter Johnson of the United States District Court for the Northern District of Georgia in the appeal proceedings before those judicial bodies.

101.    Through Sheer, Yodaiken, Settlemyer, and others, the FTC persisted in attempts to conceal the truth about fraudulent investigation and prosecution of LabMD at every possible level up to and including proceedings before the United States Court of Appeals for the Eleventh Circuit.

## COUNT ONE – MALICIOUS PROSECUTION

102.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

103.   The FTC and its officers are empowered by law to (1) execute searches and (2) seize evidence, qualifying the FTC as a law enforcement agency under the FTCA.

104.   The elements of malicious use are "malice, lack of probable cause, and termination of the proceeding in favor of the party who seeks to charge another with malicious use." *See Taylor v. Greiner*, 247 Ga. 526 (277 SE2d 13) (1981).

105.   In Georgia, malicious use "lies for maliciously suing out civil process without probable cause." *Ferguson v. Atlantic Land Corp.*, 248 Ga. 69, 71 (281 SE2d 545) (1981).

106.   There was no probable cause under the law to initiate the investigation of LabMD; for continuing the investigation of LabMD; and for the continuous resort to all available means to civilly prosecute LabMD.

107.   There was no lawful basis for initiating the investigation against LabMD; for continuing the investigation of LabMD; and for the continuous resort to all available means to civilly prosecute LabMD

108.   FTC acted improperly because it lacked the requisite statutory authority to conduct its investigation of LabMD or to initiate and pursue any civil enforcement action against LabMD.

109.   The FTC proceeded against Daugherty without probable cause.

110.   Georgia law defines malice as "Malice consists in personal spite or in a general disregard of the right consideration of mankind, directed by chance against the individual injured." O.C.G.A. 51-7-2 (2010).

111.   The FTC has no discretion that allows the initiation of an investigation justified by unlawful behavior creating a pretext of probable cause; that allows the continuation of an investigation by unlawfully fabricating evidence to create probable cause; or that allows the pursuit of a civil prosecution without probable cause based on fabricated evidence misrepresented to judicial authorities.  To do so constitutes a blatant disregard of LabMD and Michael J Daugherty's rights and well-being directed specifically at abridging those rights and that well-being.

112.   The FTC is accustomed to receiving signed consent decrees from the parties it investigates.[2]   When Mr. Daugherty, knowing he did nothing wrong,

---

[2] *See* Dune Lawrence, *A Leak Wound This Company. Fighting Feds Finished It Off*, Bloomberg (April 25, 2016), https://www.bloomberg.com/features/2016-labmd-ftc-tiversa/ ("the FTC also applies Section 5 to information security, . . .[and] reached its first settlement in this area in 2000. . . . Since then, the commission has brought

refused to sign a consent decree, the FTC acted purposely and with malice by unlawfully unleashing the whole scope of its investigative powers, without authority or discretion for the unlawful manner it exercised those powers and created and utilized fraudulent evidence, to punish Mr. Daugherty and LabMD in an unjustified attempt to force a signed consent decree.  Since the FTC's investigation was extreme,[3] unlawful and motivated solely to punish Mr. Daugherty's unwillingness to confess to an offense he did not commit, the FTC was clearly acting purposefully and with malice.

113.  The FTC acted with malice when the FTC employees, without any substantial justification, willfully and intentionally disregarded and exceeded their legitimate regulatory authority to fabricate an illegal investigation of LabMD and then engage it, with further illegal activity, in a protracted civil prosecution based on illegally obtained information and falsely justified by fraudulently information presented to judicial authorities, starting with the FTC's own office of

---

more than 60 cases related to data security. In all but one, the companies involved have . . . sign[ed] consent decrees . . .").

[3] *Id.* ("In a three-hour period on Oct. 24, 2013, commission lawyers sent notice of 20 depositions to be taken in various parts of the country, initially all scheduled at the same time on the same day.").

Administrative Law Judges and through the United States Court of Appeals for the Eleventh Circuit.

114.   The FTC lacked probable cause to proceed against Daugherty, and instead resorted to fabricating evidence. Sheer instructed Tiversa, with unlawful intent, to take the Privacy Institute data and remove metadata, intentionally making it impossible to show from where the data had originated and simultaneously making it possible for Sheer, Yodaiken and Settlemyer to continue to use the data to pursue various targets based on false evidence.

115.   Daugherty and LabMD were completely exonerated by the United States Court of Appeals for the Eleventh Circuit, a branch of the United States government, which noted  "LabMD was not a plaintiff who only obtained limited success against the government. LabMD was a defendant who obtained complete success defending itself from the government."

116.   The actual damages incurred by Daugherty include the economic destruction of LabMD as a going concern business and the unnecessary costs in pursuing the baseless FTC action, in an amount to be determined at trial.

## COUNT TWO – ABUSE OF PROCESS

117.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

118.   The FTC and its officers are empowered by law to (1) execute searches and to (2) seize evidence, qualifying it as a law enforcement agency under the FTCA.

119.   Georgia requires that "To state a claim for malicious abuse, we have required the claimant to show the existence of an ulterior motive, and an act in the use of the process not proper in the regular prosecution of the proceeding."

120.   The FTC demonstrated ulterior motives in initiating and pursuing a civil action against LabMD, including but not limited to its intent to aggrandize its reputation and the individual reputations of its attorneys at the expense of lawful prerequisites and lawful FTC procedure; to rely on illegal means to intimidate similarly situated individuals and companies; and to retaliate against Daugherty and LabMD for refusing to sign a proposed Consent Decree.   Additionally, the FTC's motives included its intent to violate Daugherty's First Amendment rights by attempts to prevent him from publishing a book describing the FTC's actions.

121.   The FTC's "act in the use of the process not proper in the regular prosecution of the proceeding," included the illegally based investigation; illegal fabrication of evidence; misrepresentation to judicial authorities and subsequent relentless litigation, which the FTC knew was solely based on information illegally obtained and fraudulently presented.

122.   The actual damages incurred by Daugherty include the economic destruction of LabMD as a going concern business and the unnecessary costs in pursuing the baseless FTC action, in an amount to be determined at trial.

## COUNT THREE - NEGLIGENCE

123.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

124.   The Court of Appeals of Georgia outlined the elements for a prima facie case of negligence in *Johnson v. American National Red Cross* as follows: "(1) a legal duty to conform to a standard of conduct; (2) a breach of this duty; (3) a causal connection between the conduct and the resulting injury; and (4) damage to the plaintiff." *Johnson*, 569 S.E.2d 242, 247 (Ga. App. 2002).

125.   The FTC has a nondiscretionary legal duty to conform its investigations to a defined standard of conduct and properly supervise the activities of its employees.

126.   The FTC breached that duty when it acted failed to properly supervise its employees who, as a direct and proximate result of such failure of supervision, conducted an illegal investigation of LabMD.   The FTC's supervision of the investigation and prosecution of LabMD did not meet the required non-discretionary applicable standards.   As employees of the agency entrusted with regulating unfair

business practices within the United States the employees and agents of the FTC should have been aware of the scope of their regulatory authority and the nature of the individuals' acts conducting the investigation and prosecution of LabMD. In pursuing allegedly unfair business practices charges without justifying those practices alleged to be unfair, not supervising the activities that resulted in the charges against LabMD, and subsequently ordering a remedy that was equally broad and unspecific, the FTC acted negligently which proximately caused an illegal investigation, an abuse of regulatory powers and consequent damage to Daugherty and LabMD.

127. The FTC pursued its investigation, and subsequent litigation, based on its employee's illegal modification of a copy of the 1718-File Tiversa provided it after stripping the meta-data. Tiversa only stripped the metadata after Sheer informed it that the original file indicated the LabMD computer as the original point and that, to be actionable, the file needed to show it was spreading on P2P networks and consequent damages. At critical points during the investigation and prosecution of LabMD, the FTC had enough knowledge to exercise more supervision of its employees, but failed to do so. The FTC's failure to properly conduct its investigation and its failure to properly supervise its employees allowed those employees to act outside the FTC's regulatory authority and the legal requirements

that applied to its activities, proximately causing serious damage to LabMD and Daugherty.

128.   Daugherty and LabMD were harmed by the FTC's negligence which resulted in the complete reputational and financial destruction of LabMD.

## COUNT FOUR – VIOLATION OF FOURTH AMENDMENT

129.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

130.   The Fourth Amendment of the U.S. Constitution protects citizens – including companies – from unreasonable searches and seizures.

131.   The U.S. government cannot invade the personal computers of private citizens and companies without a search warrant issued by a court.

132.   The FTC directed the invasion of privacy of Daugherty by overseeing the break-in of the LabMD computer, the theft of the file, and the stripping of the metadata.

## COUNT FIVE – VIOLATION OF FIRST AMENDMENT

133.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

134.   Pre-publication censorship violates the First Amendment of the United States Constitution.

135.   Retaliation for publishing a book via litigation and investigation violates the First Amendment of the United States Constitution.

136.   The FTC's motives included its intent to violate Daugherty's First Amendment rights by attempts to prevent him from publishing a book describing the FTC's actions.

## PRAYER FOR RELIEF

Whereas Plaintiff prays for a compensatory damages award of Four Hundred Million Dollars for Daugherty's damages resulting from Defendant's malicious abuse of process, malicious use of process, negligence and negligent supervision of employees.

This 25th day of August 2021.

BROWN LAW, LLC

_____/s/_____

Heather D. Brown, Esquire
Georgia Bar Number 100169
*Attorneys for Plaintiff*

138 Bulloch Avenue
Roswell, Georgia 30075
(404) 994-4300
heather@hdbrownlaw.com

# Exhibit A

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| The Federal Trade Commission | Michael J. Daugherty 425 Broadland Road NW Atlanta, Georgia 30342 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | 11/01/1960 | Single | 06/25/2019        Discovery Dt | p.m. |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

**See Attachment FTC - Daugherty FTCA Form 95 BASIS OF CLAIM**

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

**N/A**

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

**Financial Destruction of LabMD as a going concern.**
**The property was located in Georgia.**

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

**1. Reputation Damage**
**2. Contract Penalties from Early Termination for Fraudulent Accusations**
**3. Financial Destruction of LabMD as a going concern.**

| 11. | WITNESSES |
|---|---|

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| Alain Sheer and Ruth Yodaiken | Federal Trade Commission, 600  Pennsylvania Ave., NW, Mail Stop NJ-8122, |
| Robert Bobeck | 16575 Hutchison Road Odessa, Florida, 33556 |
| Rick Wallace | 8066 Diamond Springs Dr.  Helena, MT 59602-8393 |

| 12. (See instructions on reverse) | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights) |
| 400,000,000 | 0.00 | 0.00 | 400,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side) | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
|  | (404) 518-8590 |  |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government.  (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

| Authorized for Local Reproduction Previous Edition is not Usable | NSN 7540-00-634-4046 | STANDARD FORM 95 (REV. 2/2007) PRESCRIBED BY DEPT. OF JUSTICE 28 CFR 14.2 |
|---|---|---|
| 95-109 | | |

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident insurance?  ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.  ☒ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?  ☐ Yes  ☒ No | 17. If deductible, state amount.

0.00

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts.)

N/A

19. Do you carry public liability and property damage insurance?  ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code)  ☒ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident.  If the incident involves more than one claimant, each claimant should submit a separate claim form.**

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid.  A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted.  Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations.  If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant.  A claim presented by an agent or legal representative must be presented in the name of the claimant.  If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident.  Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
  A. *Authority:*  The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:*  The information requested is to be used in evaluating claims.
C. *Routine Use:*  See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:*  Disclosure is voluntary.  However, failure to supply the requested information or to execute the form may render your claim "invalid".

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501.  Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention:  Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC  20530 or to the Office of Management and Budget.  Do not mail completed form(s) to these addresses.

**STANDARD FORM 95** REV. (7/2007) BACK

**Form 95**

**FTCA**

**Attachment FTC - Daugherty**

### 8. BASIS OF CLAIM

The Federal Trade Commission intentionally and/or carelessly utilized files it knew or should have known were stolen from LabMD for use in a fraudulent administrative enforcement action against LabMD. The FTC violated Mr. Daugherty's Fourth Amendment rights. The FTC falsified evidence to justify an investigation of LabMD and to justify an administrative proceeding that otherwise had no basis. The Federal Trade Commission intentionally and/or carelessly colluded and conspired with Tiversa against LabMD to pursue an administrative proceeding that otherwise had no basis. The Federal Trade Commission intentionally and/or carelessly colluded and conspired with Mary Beth Buchanan against LabMD to cover up the fact that its administrative proceeding otherwise had no basis.

The FTC intentionally and/or carelessly concealed these material facts, and continues to conceal these facts, from Michael J. Daugherty and LabMD.

# Exhibit B

UNITED STATES OF AMERICA
Federal Trade Commission
WASHINGTON, D.C. 20580



Office of the Executive Director

Michael J. Daugherty
425 Broadland Road NW
Atlanta, GA  30342

**Re:  Administrative Tort Claims**

Dear Mr. Daugherty:

On September 4, 2020, the Federal Trade Commission received from you two administrative tort claims; one that sought $400 million in monetary damages for yourself and another one that you submitted on behalf of LabMD that sought $40 million in monetary damages. Our response relates to both claims, which allege the following:

> The Federal Trade Commission intentionally and/or carelessly utilized files it knew or should have known were stolen from LabMD for use in a fraudulent administrative enforcement action against LabMD. The FTC violated Mr. Daugherty's Fourth Amendment rights. The FTC falsified evidence to justify an investigation of LabMD and to justify an administrative proceeding that otherwise had no basis. The Federal Trade Commission intentionally and/or carelessly colluded and conspired with Tiversa, Inc. against LabMD to pursue an administrative proceeding that otherwise had no basis. The Federal Trade Commission intentionally and/or carelessly colluded and conspired with Mary Beth Buchanan against LabMD to cover up the fact that its administrative proceeding otherwise had no basis.
>
> The FTC intentionally and/or carelessly concealed these material facts, and continues to conceal these facts, from Michael J. Daugherty and LabMD.

Daugherty Claim for Damage, Injury, or Death at 3 (Sept. 4, 2020); LabMD Claim for Damage, Injury, or Death at 3 (Sept. 4, 2020).

Your claims state that the date of the alleged tortious incident or the date you discovered the act was June 25, 2019, noting "Discovery Dt" on your submissions. The Federal Tort Claims Act's statute of limitations requires a claim be presented to the appropriate government agency within two years of accrual. 28 U.S.C. § 2401(b). Accrual of a claim occurs when the claimant knew or should have known that he has been injured and who injured him. Claim accrual is

based upon an objective standard of "the discovery of sufficient facts about the injury and its cause to prompt a reasonable person to inquire" whether or not a claim exists. *Skwira v. United States*, 344 F.3d 64, 78 (1st Cir. 2003) (citing *United States v. Kubrick*, 444 U.S. 111, 118-22 (1979)). Related variations of the LabMD matter have been or were proceeding for more than a decade before June 25, 2019, initially as an investigative matter and administrative proceeding brought by the FTC against that entity, followed by litigation from LabMD against the FTC. Throughout these proceedings, and dating back to at least 2012, you and LabMD have asserted and litigated the allegations set out in your FTCA claims.[1]

Your claims were not timely presented and are therefore barred under the FTCA. 28 U.S.C. § 2401(b). Even if the claims were timely, we would recommend their denial on the merits. For example, the intentional tort claims relating to reputation damage, contract interference, deceit and malicious prosecution are generally barred under the FTCA,[2] the Fourth Amendment claims are not cognizable under the FTCA process, and the conspiracy claims alleging violations of criminal law, specifically 18 U.S. Code, Chapter 19, are under Department of Justice enforcement authority and not related to FTC tort claims. I would also note that the District of Columbia Circuit of Appeals rejected allegations very similar to those made in your FTCA claims in *Daugherty v Sheer*, 891 F.3d 386 (D.C. Cir. 2018). Significantly, the D.C. Circuit held that Alain Sheer and Ruth Yodaken – persons you identified in your FTCA claims as witnesses – acted in the scope of their duties and therefore were entitled to qualified immunity. *Id.* at 390-92.

You may challenge this final administrative decision by filing an action against the United States in federal district court not later than six months after the date of mailing of this denial. 28 U.S.C. § 2401(b); 28 C.F.R. Part 14.9. *See FDIC v. Craft*, 157 F.3d 697, 706-07 (9th Cir. 1998) (holding that claims under the FTCA must be filed against the United States rather than the agency).

---

[1] *See, e.g.*, Petition to Limit or Quash the Civil Investigative Demand Filed by LabMD, Inc., No. 102 3099 (Jan. 10, 2012) (alleging agency misconduct and collusion with Tiversa); *LabMD v. FTC et al.*, Case No. 1:13-cv-01787-CKK, Dkt. No. 1 (D.D.C. Nov. 14, 2013) (same); Respondent's Motion to Dismiss, In the Matter of LabMD, Inc., D-9357 (March 20, 2014) (same); Respondent LabMD Inc.'s Post-Trial Brief (August 11, 2015) (same).
[2] *See, e.g.*, *Hobley v. United States*, No. 07-5254, 2007 U.S. App. LEXIS 26705 (D.C. Cir. Nov. 15, 2007) (per curiam) (district court properly dismissed appellant's suit under the FTCA, because the United States has not waived its sovereign immunity for claims arising out of malicious prosecution), *Diminnie v. United States*, 728 F.2d 301 (6th Cir. 1984) (concurred with trial judge ruling that Diminnie's claims of libel, slander, and interference with contract rights were conclusively barred by 28 U.S.C. § 2680(h), which expressly excludes such claims from the statute's waiver of sovereign immunity), *Fina Air Inc. v. United States*, Civil No. 06–2219, 2008 WL 2191283 (D.P.R. May 28, 2008) (court ruled that the complaint was barred by the FTCA as a misrepresentation claim, notwithstanding airline's characterization of its complaint as one of pure negligence.), *Saks, Inc. v. United States*, 218 Fed. Appx. 350 (5th Cir. 2007) (affirming the district court's ruling that misrepresentation and deceit were excepted from the FTCA's waiver of sovereign immunity), and *Vitrano v. United States*, No. 06 Civ. 6518, 2008 WL 1752221 (S.D.N.Y. April 16, 2008) (United States retains its immunity under Section 2680(h)'s exception to the FTCA's sovereign immunity waiver for the claim relating to interference with contract rights).

Please feel free to contact Richard Gold, Tort Claims Officer, at (202) 326-3355 if you have any questions.

Respectfully,

**DAVID
ROBBINS**

David Robbins
Executive Director

Digitally signed by DAVID
ROBBINS
Date: 2021.02.26 10:38:06
-05'00'

# Exhibit C

T/C w. Rick
05.01.15

Orig. 1718 Discovery
looking for health ins. related info for Cigna?  yes
Cigna was a client @ time? yes.  Bob was going to make Cigna no
Download on PC w. regular Linewire.  aware AWD would.
Liversa special software?  to LabMD.
yes

*Cd someone else? yes but only if in same set of
computers. Can drop? reconnect.

*Shows Bob *
unreliable

Did he went to Congress? or LabMD?
⟶ Something Jussfes had last Thursday
⟶ Ticket to Cigna, drawn
⟶ Get from JV
Sent to FTC? No. LabMD - no, except through
W

file to FTC
Go through Priv. list to FTC
RW quoted disk
Bob, sent to uncle (molly)
1718 - no IP address    no cno user info -
- stripped of meta data?  PDF only PDF (1) of LabM
Didn't wanna know where it came from
"We don't care when it came from." (at DC, again later
re:

WILLFUL BLINDNESS - ARMAND

FTC came back later.
Per Bob, "need spread
Who said No IP?

Sheer in old
office

Alan Shear @ Cranberry
· we can't use if we know its coming from a US
citizen
· EW explained asi open-source, public, cust hacking
into computer
· it was decided in DC, wd remac IP top
main reason was not understand
file setup

TRAND

Why LabMD
· Bob asked yo spread on LabMD 3 others
· Bob tried to LabMD pre-DC. LabMD @
top of list

· that's when it got overwhelming "hill of
a big lie" / "how do you keep straight"

- Fraud on the court
  - By FTC - Justice
    - EVERYWHERE

Ques. for Rick

FTC Folder _____ 08/02/15

- Is this an exact copy of what was sent?
  (if so, shows ATL address)

More info on "we don't want to know where it's from"?

CX-19
difference b/w Chris & Wallace (99) — of what

on laptop @ work *
Deva - downloaded @ home also on I system or
did you just wave & go?

Authenticate
3. Ask Rick (prob) - drafted, has seen
5. No unless forwarded - has not seen
6. Ask Rick (prob) - has not seen BUT WROTE PORTIONS
    — did forensic report for Cigna, never
      for LabMD  No way wd give 64
1718 File - Difference is file name - Shuman emails?
a way to show that ← shows May 2015 coverup by
                                        WBB?

04/15     BoS - For Science @ U. Maryland (~2005)



(2?03?)
05.21.15

FTC knew from Atlanta
How? Rick's file shows IP address name on file names.
When did they strip off IP?
  · 1st sent w/ IP address on it
  · Then re-sent w/o IP addresses)
Decision?
  · At DC
  · Bob decided w/ Rick on way home.
  · later sent file (1718) w/o IP address).

1718 file saved in Sierra data store for each

hash value - fingerprint for a file          05.??.15
Did systems able to record? No.

June 14 report
Did you make it?

Ex 4  Aug. 2008 Cigna report          (H) Hard drive
real? no.          - KNOW
Wd one exist? yes
Have it? Don't think so / can check

Letter     p 2 - San Diego - IP made up by Luke -

Ex.4 Cigna file @ LabMD
Info in Ex. 4 accurate -

fig 2-2-1
pt 0/1 are true (except date of 2d?)
pt 2 fake - Bob didn't even have IP until @ that date
2013 inside address / gave to Bob.

Ex 6 Supposedly prep. Oct by Juerca to June 2014 -
"upon
Invos. Findings - (Mike did this?) search for IP info
fig 2-1-2 - list is true  ✓

# Exhibit D

CONFIDENTIAL/PRIVILEGED/WORK PRODUCT

### Chronology of events

**January 14, 2004** – Boback forms Tiversa, a PA company based in Cranberry, PA

**November 1, 2006** – Homeland Security gives a grant to Dartmouth

**July 2007** – Tiversa hires Rick Wallace as Director of Special Operations

**July 24, 2007** – Boback testifies in front of Congress for the first time. RW indicates that he was first asked to "do dirty work" in preparation for this testimony.

**February 2008** – Wallace indicates via email forwarded by Boback to LabMD that this is the date Tiversa first found the file. He states that the system did not auto-record the IP address, "most likely due to the little amount of criteria indexed against the DSP."

Later (see below), Boback in his deposition claims that it was found at an IP address in San Diego; on 2/25/08 from an Atlanta hash; that it was never downloaded from Georgia; that it was found on April 7, 2011; and that it was found on June 9, 2011 in Costa Rica or London. The fabricated IP addresses are:

| 173.16.83.112 | 11/5/2008 @ 11:26pm [173.16.83.112]insuranceaging_6.05.071 |
| 68.107.85.250 | 2/05/2008 @ 3:49pm [68.107.85.250]insuranceaging_6.05.071 |
| 201.194.118.82 | 4/7/2011 @ 2:22am [201.194.118.82]insuranceaging_6.05.071 |
| 90.215.200.56 | 6/9/2011 @ 8:13am [90.215.200.56]insuranceaging_6.05.071 |

**April 1, 2008** – Dartmouth's accepted budget for its study goes into effect. No mention of Tiversa in the amendment to the original 2006 grant. That amendment details only the changes proposed to the original proposal based on the project reviews conducted in December 2007 and new research directions not originally anticipated. The amendment appears to seek a year of funding—nothing about invoices or milestones or applicable regs.

**April 29, 2008** – Eric Johnson sends an email to Gormley at Tiversa saying that they have finished going through all the files Tiversa gave them and asking if Tiversa would share "a couple other of your recent medical finds that we could use to spice up the report."

**May 15, 2008** – Tiversa contacts LabMD and informs them they found one of LabMD's files. LabMD ultimately decides not to retain Tiversa's services.

**June 25, 2008** – Boback receives a letter from Carl Settlemeyer (an FTC attorney) stating that Chairman Waxman has requested information from the FTC. In the letter, Settlemeyer states that "[c]ertain information and materials that *Tiversa submitted* [to the FTC] may be responsive to this request."

**CONFIDENTIAL/PRIVILEGED/WORK PRODUCT**

**July 9, 2008** – Brian Krebs reports in Washington Post that "a reader" of his blog "found" Justice Breyer's social security number while searching LimeWire in June 2008. Bob instructed RW to pose as that reader in order to drum up publicity for this issue. Tiversa knew exactly where the document was found (secretary's desktop) and that it had not been exposed beyond there. Phylyp Wagner hired Tiversa for 10K/mo and went out of business.

**November 2008** – Jim Cook, one of Tiversa's attorneys, calls LabMD about turning the file over to the FTC. According to Richard Baker's memorandum, Cook said that: "He has been talking to the FTC because there are laws in place regarding leaks of personal information. His client is concerned about being sued for having knowledge of the breach and not reporting it/doing something required under the law."

**2009** – Boback doubles RW's salary, when the "bad stuff" ramped up.

**February 3, 2009** – Email correspondence between Carl Settlemeyer (an FTC attorney) and Eric Johnson (Dartmouth), wherein Settlemeyer asks Johnson for a copy of his new article on "health info available on P2P networks" once it becomes available. Johnson responds by attaching a copy of the paper.

**February 22, 2009** – Eric Johnson publishes "Data Hemorrhages in the Health-Care Sector," which states that "[e]xperiments described in this paper were conducted in collaboration with Tiversa . . . . This research was partially supported by the U.S. Department of Homeland Security under Grant Award Number 2006-CS-001-000001.

**March 2, 2009** – Article about Johnson's report is published on Wired.com; a redacted version of the File is contained in the article.

**April/May 2009** - Pittsburgh meeting with FTC. FTC asks Tiversa to supply companies with disclosures of more than 100 names, SS#s, or identifiers.

**Shortly thereafter** - RW emails Alan Sheer with a question and is told by Sheer never to do it again; no email, call, fedex or fax.

**May 5, 2009** – Boback testifies in front of Congress for the second time, this time at the subcmte on Commerce, Trade and Consumer Protection; references Marine One incident; an excerpt of LabMD's file is given to Congress.

**May 28, 2009** – Tiversa issues a press release bragging about the findings of the study it conducted with Darmouth; the press release mentions the File and claims it was found during the study.

**June 3, 2009** – The Privacy Institute is incorporated. David M. Speers (a Pennsylvania lawyer) is the named incorporator. Boback forms TPI with his friend Brian J. Tarquinio and Dan Kopchak (Tiversa's CFO), listing his uncle's address in New Jersey as the company's address. Purpose of TPI is to have a third party whom FTC can and does serve CID.

**CONFIDENTIAL/PRIVILEGED/WORK PRODUCT**

**July 16, 2009** – Tiversa Excel spreadsheet created and named FTC List71609, includes LabMD file among almost 100 others. Created in response to FTC asking Tiversa for list of all finds of more than 100 Social Security numbers. List is scrubbed by RW at BB's direction to take all then-current Tiversa clients off the list.

**July 29, 2009** – Boback testifies in front of Congress for the third time, to the House Committee on Oversight and Reform. That testimony is essentially the same as his May 5, 2009 testimony before the Subcom on Commerce.

**August 18, 2009** – The Privacy Institute responded to the FTC's Civil Investigation Demand (See Am. Compl., 23 ¶ ).

**Fall 2009 -**  DC meeting FTC (Sheer) with Tiversa (BB/RW).  Discussed that FTC needs more than original disclosure; needs spread.

**October 2009 -**  Details of confidential House Ethics Committee investigations were exposed after having been found on a P2P-enabled computer. Tiversa discovered the "Summary Report" at issue on a computer used by a Committee staffer. It then both provided the report anonymously to the Washington Post in order to ensure maximum publicity, and also falsely claimed to have found the report on computers in Washington, D.C.; New York, New York; London, England; and elsewhere.

**October? 2009** –After Boback's false testimony in May 2009 regarding the Marine One data he claimed Tiversa found in Iran, and after Boback's 2009 testimony in front of the Committee on Oversight, in which Boback declared that Tiversa had found details regarding the First Lady's safe house, the President's motorcade routes and other similar data via P2P networks, Tiversa agrees to find other similar documents the Committee could use in its debates regarding banning P2P technology from Government computers. Tiversa found a document containing personal information of United States' soldiers from the Third Special Forces Group, including the names and ages of the soldiers' spouses and children. The information was found only on the P2P-linked computer of the wife of someone in the Special Forces. Boback instructed RW to link it to Pakistan.

**Months following Fall 2009 meeting:**   Sheer pressures for spread.  RW is reluctant.  Bob directs Tiversa communications through CFO Dan Kopshak.  RW sits in on weekly calls between FTC and Kopshak.  Weekly calls with FTC about how finances would work; how will Tiversa be compensated?

**January 2010** – Alain Sheer calls LabMD to say that he was sending a letter about the File.

**February 2010** – LabMD responds to the FTC letter with documentary evidence.

**Approximately Summer 2010:**  Bob directs RW to create txt file with spread – "make sure bad guys."  Original file includes original Atlanta IP address and not San Diego address that was conveyed in litigation. The 3 fake IP addresses were associated with modified files inserted in data stores.

**CONFIDENTIAL/PRIVILEGED/WORK PRODUCT**

**June 21, 2012** – FTC Dissenting Statement is filed by Commissioner Rosch.

**August 15, 2012** – Mike's lawsuit against Tiversa is dismissed for lack of jurisdiction

**November 8, 2012** – Tiversa sends its first cease and desist letter

**June 24, 2013** - The Privacy Institute files a revival of its charter, having administratively dissolved for failure to file a complete annual franchise tax report by March 1, 2013. The Revival of Charter is filed on June 24, 2013 at 1:23 pm. One minute later, a Certificate of Dissolution is filed, noting that the sole director/officer of the Institute is Brian J. Tarquinio, who is a childhood friend of Boback. The address listed as the Institute's is Boback's uncle's address.

**August 28, 2013** – FTC files a complaint against LabMD

**September 24, 2013** – *The Devil Inside the Beltway* is published

**October 2013:** Bob directs RW to recreate spreadsheet txt to produce to FTC – this time with San Diego IP address, not Atlanta one; so, three original fake files plus addition of San Diego. RW was told to create the San Diego modified file to produce with February 2008 modified date. Bob stands over him as he does it. The San Diego IP to use was identified by Bob – for some reason it was important for it to originate in CA.

**October 17, 2013** – Tiversa sends its second cease and desist letter.

**January 30, 2014** - LabMD notices a subpoena for RW, originally for February 18, 2014, but later jointly agreed to happen on March 4, 2014.

**February 26, 2014** – Tiversa's attorney Jarrod Shaw informs LabMD that RW is "no longer available" for depo due to an "unexpected medical issue."

**March 5, 2014** – Boback gives RW a severance agreement.

**March 16, 2014** – Boback sends email to RW and AW saying that "the whole process" of RW's termination is out of his hands and urges him to sign the severance agreement.

**April 2, 2014** – RW contacts MD by phone and tells him that he resigned on April 1, 2014 after Boback demanded that he lie under oath for the FTC deposition; the four IP addresses given to the FTC re the File were not the sources of the LabMD file; it was never found anywhere other than the LabMD computer; and Boback lied when he said in depo that it was found in San Diego and other locations.

**April 3, 2014** – RW contacts MD by phone and tells him about the Marine One lies and that he personally took the LabMD file from a LabMD computer.

**April 7, 2014** – Tiversa attorney informs LabMD by email that RW is no longer employed by Tiversa.

**CONFIDENTIAL/PRIVILEGED/WORK PRODUCT**

**April 30, 2014 - RW, contacts, JMV.**